UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WERNER FIGUEROA GARCIA,

    Petitioner,

     v.

SCOTT ZOLDAK, SUPERINTENDENT,

    Respondent.

No. 1:23-CV-11432-AK

**REPORT AND RECOMMENDATION ON
PETITION FOR WRIT OF HABEAS CORPUS**

CABELL, U.S.M.J.

## I. **INTRODUCTION**

Werner Figueroa Garcia ("Garcia" or "the petitioner") is serving a life term of imprisonment following his state court conviction on charges of second-degree murder and assault and battery. He moves under 28 U.S.C. § 2254 for a writ of habeas corpus reversing his conviction on the ground that the trial court improperly denied his motion to suppress post-arrest statements he contends were obtained in violation of his Fifth Amendment right against self-incrimination. The matter has been referred to me for a report and recommendation. For the reasons that follow, I recommend that the petition be denied.

## II. <u>RELEVANT BACKGROUND</u>

### A. <u>Factual Background</u>

The facts as set out by the Massachusetts Appeals Court ("MAC") are as follows:[1]

1. <u>The murder.</u>  Sergio and Antonio arrived at the Las Vegas Bar and Restaurant sometime after 6 p.m. on May 13, 2017.  Drunk and tired, Antonio left around midnight and began walking home.  Antonio returned after Sergio called and told him that "a couple of people were causing him trouble."

a. <u>The first attack.</u>  Sergio met Antonio outside the restaurant just after 1 a.m. and identified three men near the front door -- Werner[2], Selvin, and their friend, Mario (footnote omitted) -- as the people causing him trouble.  While Sergio spoke with one of the waitresses as she was preparing to leave for the night, Antonio told Werner, Selvin, and Mario that he and Sergio did not want any problems.  They replied that Sergio was "a son of a bitch."

After the waitress departed, Sergio approached Werner, Selvin, and Mario, who were standing just outside the restaurant.  Sergio spoke to them, but Antonio could not hear the conversation.  Shortly thereafter, Werner stepped out of the restaurant's vestibule and punched Sergio in the face.  A fistfight ensued.  As Antonio tried to stop Selvin from joining the fight, Selvin punched Antonio multiple times.  Antonio fought back.  Werner knocked Sergio to the ground, then Werner and

---

[1] In habeas proceedings initiated by a prisoner in state custody, "a determination of factual issues by the State court should be presumed to be correct."  28 U.S.C. § 2254(e)(1).  The petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.*  In this case, the Massachusetts Supreme Judicial Court relied on the facts as set forth by the MAC.  The petitioner does not seriously challenge the MAC's factual findings in his petition and regardless has not presented clear and convincing evidence to rebut the presumption that the MAC's factual findings are correct.

[2] Because the defendants and the victims shared last names, the MAC referred to them by their first names to avoid confusion.

Selvin walked away.  The fight was brief, and neither Antonio nor Sergio sustained serious injuries.

b. The second attack.  After gathering themselves and searching for Sergio's glasses, Sergio and Antonio left the area of the restaurant on foot and in search of a taxi.  Meanwhile, surveillance video footage showed Werner and Selvin fleeing the scene of the first attack; they ran up the street away from the bar, toward the Omar & Oscar jewelry store.  As Antonio and Sergio walked in the same direction and stood at the entrance of the jewelry store's parking lot, Werner and Selvin approached them and attacked Sergio a second time. Antonio tried to stop Selvin, but Selvin punched Antonio "really hard," as Werner continued to beat Sergio. Antonio ran into the street to call 911.  Selvin followed for a short distance before returning to the parking lot, where Werner continued to beat Sergio.  As he spoke to the 911 operator, Antonio yelled at Werner and Selvin to stop and told them the police were coming.  Werner and Selvin then left the scene of the second beating. When Antonio returned to the parking lot, he saw Sergio lying face down on the ground, shaking.

c. The third attack.  About a minute later, Werner and Selvin returned to the parking lot.  As they approached, they both put up the hoods of their sweatshirts.  Selvin tapped Werner on the back, and they then moved quickly toward Antonio and Sergio.  When Antonio saw Werner and Selvin, he retreated into the street.  Werner and Selvin rushed Antonio and "beat [him] up."  Antonio described a baseball-sized "brick or something like that" that Werner used to hit Antonio on the left side of the face, breaking Antonio's nose and teeth.  Antonio escaped by jumping on the hood of a car and running down the street. Werner and Selvin then ran at Sergio, who lay motionless on the ground, and each kicked him once in the head; first Selvin, then Werner.  Werner and Selvin then fled on foot.

2. The investigation.  Police officers arrived on the scene and found Sergio bloody and unresponsive.  He had a "baseball size soft spot ... in the back of his skull" and struggled to breathe.  One of the officers observed a red brick on the ground close to Sergio's body.  Sergio

3

was taken to the hospital, where he was pronounced dead later that morning.  An autopsy revealed that Sergio died of subarachnoid hemorrhaging -- bleeding between the brain and its outer arachnoid membrane.  His injuries were consistent with being punched, kicked, and hit with an object.  Any one of the several blunt force injuries to the head could have caused Sergio's death.

A few days after the murder, police arrested Werner and Selvin and executed a search warrant at their residence. Police seized clothing, including Werner's sweatshirt, which contained Sergio's blood and deoxyribonucleic acid (DNA).  Werner and Selvin were interviewed after signing Miranda waivers.  Werner and Selvin initially denied or minimized their involvement, but later acknowledged their participation when confronted with the surveillance video footage.

3. The defenses.  Neither defendant testified at trial. Werner called one witness, a pathologist who testified regarding Sergio's injuries and the cause of death. Through counsel, Werner acknowledged his participation in the fight, but denied any intent to kill Sergio. Selvin's counsel also argued that Selvin did not intend to kill Sergio, and that there was "no evidence of where Selvin was or what he was doing" when the fatal blow was struck.  Selvin's counsel acknowledged that it was "reprehensible" for Selvin to kick Sergio in the head but argued that the kick did not cause Sergio's death.

*Commonwealth v. Figueroa-Garcia*, 2022 WL 791071, at *1-2 (Mass. App. Ct. March 16, 2022) (internal footnotes omitted).

B. **Procedural Background**

1. **State Court Proceedings**

On August 17, 2017, a grand jury sitting in Essex County indicted the petitioner for (1) murder of Sergio Sanchez; (2) armed robbery of Antonio Sanchez; and (3) assault and battery of Antonio Sanchez causing serious bodily injury.  On January 31, 2018, the

4

petitioner moved to suppress a statement he had provided to the police on the grounds that it was involuntary, and that he did not knowingly and voluntarily waive his *Miranda* rights.  After an evidentiary hearing, the court denied the motion.

After an eight-day trial in September 2019, the jury convicted the petitioner of second-degree murder and assault and battery (as a lesser-included offense of assault and battery causing serious bodily injury) and acquitted him of armed robbery.  On September 25, 2019, the petitioner was sentenced to life in prison with eligibility for parole after 20 years.

The petitioner appealed but the MAC affirmed his conviction. *Figueroa-Garcia*, 2022 WL 791071, at *8.  The petitioner then appealed the MAC's affirmance, but the SJC denied his application for leave to obtain further appellate review ("ALOFAR"), on June 30, 2022.  *Commonwealth v. Figueroa-Garcia*, 192 N.E.3d 251 (Mass. 2022).

### 2. **The Federal Habeas Petition**

The petition advances five claims:  (1) the trial court erred in denying the petitioner's suppression motion because the Commonwealth failed to prove that the petitioner's waiver of his *Miranda* right to remain silent was knowing, intelligent, and voluntary; (2) the petitioner's trial should have been severed from that of his co-defendant because they pursued mutually

antagonistic defenses; (3) the trial judge erred in admitting a brick that was found near the decedent's body into evidence; (4) the judge improperly instructed the jury on manslaughter; and (5) the evidence was insufficient to prove the petitioner acted as a joint venturer with the mental state required for second degree murder.  (D. 1).

Of these five claims, however, the petitioner addresses only the first ground in his accompanying memorandum of law.  (D. 24). Given the petitioner's conscious failure to brief Grounds Two through Five, the court deems those claims to be waived and does not address them further.  *See Glacken v. Dickhaut*, 585 F.3d 547, 551 (1st Cir. 2009); *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) (issues adverted to in a "perfunctory manner," unaccompanied by some effort at developed argumentation are deemed waived); *see also Carrington v. Massachusetts*, 490 F. Supp. 3d 410, 417 (D. Mass. 2020); *Lamartine v. Ryan*, 215 F. Supp. 3d 189, 193 (D. Mass. 2016) (collecting cases).

## III.  <u>STANDARD OF REVIEW</u>

"Federal habeas is not an ordinary error-correcting writ." *Nadworny v. Fair*, 872 F.2d 1093, 1096 (1st Cir. 1989).  It "exists to rescue those in custody from the failure to apply federal rights, correctly or at all."  *Id.*  Habeas relief is only available if a prisoner "is in custody in violation of the Constitution or

laws or treaties of the United States." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (internal quotations and citations omitted). A writ of habeas corpus thus "does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

A federal court may grant a writ of habeas corpus only if the underlying state court adjudication:  (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  28 U.S.C. § 2254(d) (as amended by the Antiterrorism and Effective Death Penalty Act of 1996).

The petitioner invokes the first ground here and argues that the MAC's determination involved an unreasonable application of clearly established federal law.  A decision involves an unreasonable application of federal law where "the state court correctly identifies the governing legal principle from [the Supreme Court] decisions but unreasonably applies it to the facts of the particular case." *Id.*  The magnitude of the error "must be great enough to make the decision unreasonable in the independent and objective judgment of the federal court." *Brown v. Ruane*, 630 F.3d 62, 67 (1st Cir. 2011) (quoting *McCambridge v. Hall*, 303 F.3d

24, 36 (1st Cir. 2002)).  Even assuming the state court committed an error, habeas relief is only appropriate if the error had "a substantial and injurious effect or influence in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993).  In other words, habeas relief cannot be granted for "harmless" errors, which are defined as those errors that did not impact the verdict.

Finally, a petitioner is not entitled to habeas relief on any claims unless they have fully exhausted their available state court remedies by "giving the State the opportunity to pass on and correct alleged violations of its prisoners' federal rights."  28 U.S.C. § 2254(b)(1)(A); *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (internal quotation marks omitted).  In order to present a federal claim to the state courts in a manner sufficient to satisfy exhaustion concerns, a petitioner must present the factual and legal underpinnings of the federal claim to the state's highest court.  *Adelson v. DiPaola*, 131 F.3d 259, 263 (1st Cir. 1997).  The exhaustion requirement "is not satisfied if a petitioner presents new legal theories or new factual allegations in federal court that transform his claim or cast it in a significantly different light."  *Domaingue v. Butterworth*, 641 F.2d 8, 12 (1st Cir. 1981).  A habeas petitioner cannot continue to litigate a

petition containing any unexhausted claims.  *Adelson*, 131 F.3d at 261.

## IV. <u>DISCUSSION</u>

### <u>The Petitioner Has Not Fully Exhausted His *Miranda* Claim</u>

The petitioner contends that the trial court erred in denying his suppression motion when it found that he knowingly, voluntarily, and intelligently waived his *Miranda* right to be silent and consult with an attorney before speaking with the officers.  The petitioner argues that officers violated his Fifth Amendment constitutional right against self-incrimination because they used "trickery", twice, to get him to waive his rights, by telling him (improperly) that his most important *Miranda* right was the right to forfeit his right to remain silent.  Citing *Miranda*, the petitioner argues that "[n]o amount of circumstantial evidence that the person may have been aware of this right [to have a lawyer with him during interrogation] will suffice to stand" in the absence of an adequate warning.  *See Miranda v. Arizona*, 384 U.S. 436, 471-72 (1966) ("No amount of circumstantial evidence that the person may have been aware of this right will suffice to stand in its stead.").  Distinguishing between statements made by officers to a suspect during an interrogation and those made when informing them of their *Miranda* rights, the petitioner argues that "trickery in the interrogation room may be acceptable" but a constitutional

violation occurs when the "courts allow tricks with rights".  As such, so the petitioner argues, the *Miranda* warnings he received were constitutionally inadequate, and the court erred when it found based on the warnings he received that he had knowingly, voluntarily, and intelligently waived his right to remain silent and have an attorney present during questioning.

This, however, is a markedly different argument than the one the petitioner presented to the MAC and SJC.  To be sure, the petitioner's federal claim does at a macro level bear a resemblance to the claim he pressed in the state courts.  There, just as he does here, the petitioner argued that the trial court erred in finding that he knowingly, voluntarily, and intelligently waived his *Miranda* rights.  However, the theory of the petitioner's argument there, and the facts he relied upon to make it, differed substantially.

Specifically, the petitioner never argued to the MAC or SJC that officers tricked him into waiving his right to have an attorney present during questioning.  Rather, he argued that the record failed to show that he ever actually understood what the officers were saying to him.  Similarly, whereas the petitioner's federal claim focuses factually on what police officers said to

10

him, his state court argument focused solely on what he said in response.

In his brief to the MAC, for example, the petitioner argued that the trial court "did not address any non-responsive or unclear answers by the defendant regarding the question of whether he understood his right to have counsel present at the interrogation." The petitioner noted that he merely responded "Mhm" when asked whether he understood that anything he said could be used against him, and gave similar responses when told that a video of his interview would be provided to his attorney ("Ahh"); that he did not have to answer a question if he did not want to do so ("Ahmm"); that officers would stop the interview at any point the petitioner wished ("Aha"); that officers intended in response to the petitioner's question to explain why they wished to speak with him ("Aha"); that he would be going to court the next day no matter what happened ("Mhm"); and that officers understood that the petitioner understood them but did not understand why he was being charged ("Aha"). The petitioner argued that these "non-responsive or unclear responses" "raised significant doubt" as to his comprehension as to what was occurring, and thus whether his subsequent waiver was knowing, intelligent, and voluntary.[3]   By

---

[3] The petitioner raised a similar argument in his ALOFAR to the SJC.  He argued there that his constitutional right against self-incrimination was violated under *Miranda* because "non-responsive or unclear responses by the [petitioner]

contrast, the petitioner did not ever argue that officers violated his rights by manipulating and tricking him into waiving his right to remain silent.

Consequently, the MAC also limited its considerations to whether the officers reasonably conveyed the substance of the defendant's rights and whether the petitioner understood those rights, and thus knowingly, intelligently, and voluntarily waived his right to remain silent.  The MAC did find that a portion of the officers' recitation -- telling the petitioner "[a]nd this is what is most important," immediately before explaining that he could waive his right to remain silent -- was improper, but the petitioner never raised any claim of manipulative or deceptive conduct with respect to that portion of the officers' statements, and the MAC found on balance that the officers adequately advised the petitioner of his rights, and the petitioner understood those rights.

In sum, the petitioner has abandoned the failure-to-comprehend argument he presented to the MAC and SJC and, in its place, now argues, for the first time, that officers tricked him into waiving his right to remain silent by telling him that the most important right he enjoyed was the right to waive his right

---

to the police interrogation raised significant doubt as to the [petitioner's] comprehension as to what was occurring."

to remain silent.  This effectively dooms the petitioner's claim. When "the factual underpinnings of [a] habeas petition are substantially different from those presented to the state court, [the petitioner] has failed to exhaust his state remedies as required by statute." *Gaskins v. Duval*, 89 F. Supp. 2d 139, 142 (D. Mass. 2000).  As that is the case here, the petition should be denied for failure to exhaust.  *See Coningford v. Rhode Island*, 640 F.3d 478, 482 (1st Cir. 2011) (A "petitioner's failure to present his federal constitutional claim to the state courts is ordinarily fatal to the prosecution of a federal habeas case."); *see also Fernandes v. Alves*, 706 F. Supp. 3d 161, 163-64 (D. Mass. 2023) (habeas petition claim that state prosecutor had impermissibly excluded black jurors on basis of race found to be unexhausted where improper-jury-selection claim presented to the SJC centered on age rather than race); *Agabalian v. Divris*, 621 F. Supp. 3d 180, 184-85 (D. Mass. 2022) (petitioner's habeas claim that *Miranda* waiver was invalid due to deficient warnings found to be unexhausted where ALOFAR to SJC addressed at length the allegedly coercive nature of the petitioner's custodial interrogation and involuntariness of his statements due to his intoxication and difficulty understanding English but made no contention as to any alleged deficiency of the *Miranda* warning); *Gaskins*, 89 F. Supp. 2d at 141-42 (petitioner's habeas argument

13

that state prosecution had used perjured testimony to obtain his conviction found to be unexhausted where he had raised similar claim in the state courts but relied on different evidence in doing so).

**The Petitioner's Claim Fails Even If Reached on the Merits**

Even assuming the petitioner's federal constitutional challenge is reviewable by this court, the habeas petition should be denied on the merits. *See Clarke v. Spencer*, 582 F.3d 135, 145 (1st Cir. 2009) (explaining that although claim was unexhausted in state court, federal habeas court "can still address the merits" when "the issue does not warrant habeas relief.").

The petitioner argues that the state courts made an "unreasonable application" of Supreme Court precedent. He argues specifically that the state courts misapplied the precedent from *Miranda v. Arizona*, 384 U.S. 436 (1966), *Duckworth v. Eagan*, 492 U.S. 195 (1989), and *California v. Prysock*, 453 U.S. 355 (1981) in finding that "the officers reasonably conveyed the substance of the [petitioner's] rights." *Figueroa-Garcia*, 2022 WL 791071, at *4.

A decision involves an "unreasonable application" of federal law where "the state court correctly identifies the governing legal principle from [the Supreme Court] decisions but unreasonably applies it to the facts of the particular case." *Id.* The magnitude

14

of the error "must be great enough to make the decision unreasonable in the independent and objective judgment of the federal court." *Brown*, 630 F.3d at 67.

Under *Miranda*, an individual is required to "be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he desires." 384 U.S. at 479. *Duckworth* and *Prysock* add that *Miranda* warnings need not be given in the exact form described in *Miranda* but must reasonably convey to a suspect his rights. *Duckworth*, 492 U.S. at 203; *Prysock*, 453 U.S. at 359. As such, the three cases together hold that police must effectively convey the core constitutional rights to a suspect but have some flexibility in the specific wording and order of delivery.

Here, the main point of contention is whether the officer's following explanation that the petitioner could waive his rights was adequate (or not) under *Miranda*, *Duckworth*, and *Prysock*:

> *And this is what is most important.* You can also give up the right to a lawyer and your right to remain silent and can answer any question or make any declaration that you want. If you decide to answer questions, you can stop at any time to consult a lawyer or for any reason. So if you decide that you want to talk to us and I ask you a question, and you don't want to answer it, you don't have to answer it, you don't have the obligation

to answer it. ... [S]o having those rights in mind, [d]o you want to talk to us or not?

2022 WL 791071, at *4 (emphasis added).

The MAC noted that the officers' characterization "[a]nd this is what is most important," immediately before explaining that the petitioner could waive his right to remain silent, was improper, but that "[b]ut for that characterization, the Miranda warnings were accurate." 2022 WL 791071, at *4. Viewing the officers' statements by a totality of the circumstances, the MAC found that "the officers reasonably conveyed the substance of defendant's rights" in line with *Duckworth*. *Id.* The petitioner counters here that the MAC's holding is an "unreasonable application of *Duckworth* [that] drains the meaning of *Miranda* too far," but the court agrees with the MAC.

While the officer's characterization of the importance of waiving the right to have a lawyer present was overstated, and to that extent unquestionably improper, it was not so improper when looked at in context of the entire warning so as to change the substance of the reading and violate *Miranda* and its progeny. Crucially, the officer's initial warnings to the petitioner "touched all of the bases required by *Miranda*" where the petitioner was told he had the right to remain silent, that anything he said could be used against him, that he had the right to consult an

16

attorney, and that an attorney would be appointed for him if he could not afford one.  *See Duckworth*, 492. U.S. at 203.  Further, the officers throughout their conversation emphasized no less than five times that the petitioner did not have to talk to them if he did not want to do so, telling him "you can stop at any time"; "you don't have to answer it"; "you don't have the obligation to answer it"; "[i]f you decide to talk to us and at any time you say I don't want to talk any more, we stop talking"; and "[k]now that, like I explained to you before, that if you decide to talk, and and [sic] at any moment you want to stop talking, you can stop." Even accepting that the officer's statement to the petitioner about waiving his right to silence and the presence of an attorney was improper, nothing in *Miranda*, *Duckworth* or *Prysock* suggests that the statement so tainted the integrity of the recitation of *Miranda* rights as a whole so as to render those warnings constitutionally inadequate.  The court accordingly finds that the MAC did not unreasonably apply relevant Supreme Court precedent in making its determination.[4]

---

[4] The petitioner also contends in a single sentence that the MAC erred in determining the facts to the extent it found that officers did not engage in trickery in obtaining his waiver.  The assertion has no force because the petitioner, as noted above, never argued to the MAC that the officers engaged in trickery to obtain his waiver, and the MAC correspondingly made no findings regarding this assertion.  It is true that the trial court evaluated the exchange between the petitioner and the police and concluded that "the police engaged in no coercion, misrepresentation, or trickery" . . ., *Commonwealth v. Figueroa-Garcia*, No. 1777CR00419, 2021 WL 8015654, at *2 (Mass. Super. May 28, 2021),

**Even If There Was Error, It Was Harmless**

Finally, even if the state court committed an error, the court finds that it was harmless.  As the MAC noted, "[the petitioner's] statements were cumulative of other evidence and were not critical to the Commonwealth's case."  2022 WL 791071, at *4.  In particular, DNA evidence linked the petitioner to the attacks and the victim's death, as did surveillance video footage showing the petitioner initiating the attacks on the victim and kicking him in the head after he had lost consciousness.  *Id.*  Not surprisingly, the prosecutor focused on the surveillance video footage in his closing argument and did not even mention the petitioner's recorded statement.  *Id.*  More, the petitioner's attorney *did* use a statement from the petitioner's recorded statement -- "I never thought this would happen" -- to argue that the petitioner did not intend to kill the victim.  As such, to the extent the petitioner's statements were highlighted by any party, they were used by the petitioner for his benefit.  The court agrees with the MAC that on this record, even assuming the trial court erred in denying the petitioner's suppression motion, the error was harmless beyond a reasonable doubt and did not have a substantial effect or influence the jury's verdict.

---

but the petitioner never raised the "trickery" aspect of the trial court's ruling with the MAC or SJC.

## V.   CONCLUSION

The court **RECOMMENDS** for the reasons noted above that the habeas petition (D. 1) be **DENIED.**[5]

/s/ Donald L. Cabell
DONALD L. CABELL, U.S.M.J.

DATED: June 11, 2026

---

[5] The parties are hereby advised that under the provisions of Federal Rule of Civil Procedure 72(b), any party who objects to this recommendation must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.  *See Keating v. Secretary of Health and Human Servs.*, 848 F.2d 271 (1st Cir. 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986).